We are here because there are fact issues supporting Mr. Tatum's equitable estoppel and FMLA claims that the district court did not consider. So we are asking the court to reverse and remand this case for trial. I'd like to discuss a few fact and legal issues subject to this court's questions. So first, the plant did not conduct a fact-finding meeting with Mr. Tatum to find out his intentions regarding his safety report. So Mr. Tatum requested FMLA leave on January 20th. The decision-maker made the decision on January 23rd at the end of the day, saying it has come to his attention that there's nothing left to do but terminate Mr. Tatum's employment. So in between those two times, January 20th and January 23rd, two events occurred. He engaged in protected activity requesting FMLA leave. And earlier that morning, before he requested FMLA leave, he had a coaching meeting with Mr. Ron Ray and the rest of his managers. He was coached on his interactions with a fellow employee or a fellow co-worker. And on that, at the end of that meeting, before he requested FMLA leave, Mr. Ray committed to Mr. Tatum that the next event would be his last, basically giving him a final warning. So that occurred, and then later in the evening, Mr. Tatum reported a safety issue that another co-worker had committed, Mr. Wayne Goodman. So in between those times, January 20th and the end of the day on the 23rd, there was no final event, no run-in with another co-worker. Mr. Tatum did his job. He reported a safety issue, and there was no fact-finding meeting to determine what Mr. Tatum's intent was. And that's significant, as this court has found in Ayin v. Chevron, where this case, and Judge Elrodi were on that panel, or I believe you wrote the decision, what a co-worker said. So in Ayin, it was another FMLA case. A co-worker accused the plaintiff employee of basically kind of making up a health condition to get out of work and take FMLA leave for false reasons. The employer took that co-worker at his word, did not confront the employee. Was this true or was it not? The court found this important because it goes to what the reason was for his termination. We need to show pretext here, and pretext is cover for the true reason. If you can eliminate the reasons that the employer gave for terminating an employee, the only other reason, if they knew about FMLA leave, which in this case, Ron Ray did know that Mr. Tatum had taken FMLA leave, requested FMLA leave, followed up on that leave. So we can eliminate, in this case, just like in Ayin, those other reasons for looking for leave. He was given a final warning. What would have occurred, in your view, what should have occurred at a fact-finding meeting, had there been one? What would have been said, or what would have been the issue, what would have been the inquiry? What were your motives in this? They attributed that... What were your motives for what? In taking the picture that was sent in the report of the safety issue. Why did you report it at this time? Why did you wait? It would have come out, those reasons. They attributed his motives, I believe, falsely, and I think the evidence reflects that. As kind of... Ron Ray thought earlier in the safety meeting, the morning of the termination, or the morning of the FMLA leave. He said, apparently, he has a rock to throw that could get a man's job. Mr. Ray connected the two things of, this is the rock he was talking about. And that's, I mean, that's an assumption. I mean, a court, an employer can take, it can terminate somebody for non-retaliatory, any non-retaliatory reasons it wants, but it has to have a process for finding that, and it has to be truthful. Where here, there's evidence that it wasn't truthful. They didn't follow their own process, even for coaching, they talked with him. I know that in public employment, the case law speaks in terms of pre-termination or post-termination hearings. But I mean, are you saying that in the sphere of private employment, that there's a legal requirement of having a hearing or a meeting? No, I'm not. Or just that it would have been better if they had? No, I'm not saying that at all. Where the employer doesn't follow their own process, their own disciplinary process, that's probative of pretext. So it's your position that they had... Go ahead. You're saying that was part of their normal process and they didn't follow it. That's the part you haven't linked up. Is that what you're saying? That's correct. We have the disciplinary policy as part of the record. It's at ROA 595. It describes it as a structured interaction between the supervisor and subordinate. And this is for all levels of discipline, coaching to all the way to termination. Discipline, and then... So he was coached on January 20th. And Duron Ray explained coaching in his deposition. He says, I make sure I ask everybody first their perception of the situation. And then I ask... But it's not about coaching. The question is about whether or not there's a policy that they have to have a meeting to go over this. Their own disciplinary policy. And it specifically says that. Yes. What about the fact that there were less than 50 employees? So FMLA didn't come in at all? Yes, Your Honor. And that's true. And this court has found an equitable estoppel doctrine, which is a fairness doctrine, which says if you go out of your way to tell an employee that the FMLA applies to them, you go and tell them they're covered, they have job protection, you can't later go back on that if the employee changed position and suffered a detriment. And really, the whole case turns on whether he suffered a detriment. Was he terminated wrongfully? And if he was, then that's obviously a detriment. Again, by the end of the day on the 23rd, Ron Ray decided to make the termination. He decided to terminate Mr. Tatum. That day, he talked with Wayne Goodman and Mack Finn, who saw the picture being taken. He was with Mr. Tatum at that time. And he attributed Mr. Tatum's motives. Had Mr. Tatum been at work at that time? Had he not been out on FMLA leave? He would have heard about all this, and he would have had the opportunity to clarify. He was terminated. The reasons why he was terminated don't—there are fact issues that call those reasons into question. So to answer your question, where an employee meets all the elements of equitable estoppel, we have fact issues here. And equitable estoppel is a fact-intensive question. There are facts that can lead a reasonable juror to believe that he did suffer a detriment that was linked with his FMLA leave. Had he been at work, he would have had the opportunity to clarify what his true motives were. And his true motives were—it's consistent throughout his career. He beat the drum for safety the whole time he was there. In his performance reviews, the managers praised him for his questioning attitude, for reporting safety. They only had a concern with how he reported it. And they gave him coaching on that. They told him, verify that there is, in fact, a safety concern before you report it. And also defer to experts. Mr. Tatum did follow his coaching there. There are fact issues that can—considering those facts, a reasonable juror can find the reasons why they terminated him were not legitimate, basically. So, yes, he didn't get the same opportunities as other employees that were on FMLA leave. The plant derived from their usual course of action after they term—in terminating Mr. Tatum without doing an investigation, asking him, giving him the opportunity to clarify its misconceptions. And, again, I'll say that they can terminate him for the reasons they gave. It's just, were those truthful? Did they follow their own process? Were they right that he had some bad intentions? Those are all fact questions that the record shows enough that he actually did his job while on leave. He did verify that there was a safety issue to report. Days later, he did report it. He deferred to an expert. The man that actually committed the safety issue was an expert on the clearance process, the process that Mr. Tatum thought was and followed. So he's following his coaching, and then he reported the issue timely. They thought otherwise. This goes to pretext, is that right? Yes. So I, in my argument, I loop the whole thing of was he terminated correctly, because it goes to both. If he wasn't terminated, if he was terminated correctly, he doesn't have that strong of an FMLA interference claim. It's just a matter of the future damages. But without the FMLA claim, it's an employment at-will state, so they could terminate him for any reason or no reason at all, right? That's correct, except that in this case— It's only if it's—so it only goes to the pretext as to FMLA, doesn't it? And as I was answering for Judge Weiner's question, it would have made a difference that he was away from work. He would have kept his job had he not been on FMLA leave, or at least there's evidence that a reasonable juror could show—could make that decision. And for that reason, he meets every element of equitable estoppel. He said, you know, in his affidavit, I would have returned back to work had I known I wasn't covered. Him being at work would have saved his job. He would have been part of this conversation with Mack Finn and Wayne Goodman where they were discussing the safety issue. I mean, the whole reason he was terminated is because Mack Finn, a co-worker, said, he told me, I took that picture as insurance, as job security. That's something another co-worker said. And in the Ion case, the court rejected that, considering that that employer looked at—that employer didn't confront the person. They gave him a final warning in that case, as in this case. They didn't follow their own process. Their base—their reasons are unworthy of credence. In this case, this court also recently decided a case, Caldwell v. KHOU, where it was an ADA case, but the same thing, where an employer's reasons aren't worthy of credence. You can find that they—a juror can discount them and find what's the true reason. It could be discriminatory. In this case, Ron Ray knew all the—he was in the loop about the FMLA requests. Where an employer or a decision-maker doesn't know, that's something else. But again, in between January 20th and 23rd, Mr. Tatum engaged in protected activity. He reported a safety issue. And Mr. Ray just wouldn't—he separated from his previous course of action. It's—I describe it in the briefs as an about phase. What—that's very unusual for him to say. In coaching, especially even in that previous meeting on the 20th, he talked to everybody. He talked to Mr. Tatum. And the reason for that was he wanted to find out what was his—what was going through his mind. Is there some opportunity here that I can work with? And then, all of a sudden, he decides this employee isn't worth saving. Basically, he's never going to change. There's nothing that would have led him to believe that. He just took Mack Finn at his word. And in previous cases, this court, they—has looked at not only was the—what was the process, was that done in good faith? So, a couple of cases, Richardson v. Monotronics, the employer's failure to follow its own progressive disciplinary policy may be probative of discriminatory intent. That's what this court found. And really, the reason doesn't matter. It's just what was the process? So, for example, Hisone v. Karabin and Shaw, the case where a paralegal was accused of not following a policy of getting their boss's approval before sending out letters to an administrative agency, she was accused of missing deadlines. The employer didn't do any sort of investigation into that, and this court found that there were pretext issues here. There—even in the case of DeVos v. Southwest Airlines, where there was an honest belief, and that honest belief was the reason for termination, that's the key. Did—was there—did they make that decision—did Mr. Wray make that decision in good faith? And we would argue no. He had no reason to think other than taking a co-worker's word, which, in my end, that's not enough. There's enough here that a jury could find. Yeah, but why isn't that a good faith? That Finn suggested that Tatum held on for job security. Tatum had already said, I've got some kind of thing in my pocket. That's what Ron Wray is saying. Okay, well, has he denied it? He said exactly in the affidavit why he reported the issue when he did. But he's—well, it's undisputed, then, that he said, I've got some kind of insurance policy. No, that's disputed. It's disputed. Did he deny it in the record? Yes. Okay, I just asked you that. He said he said something else. So he denied it in the record. Okay, take that one away, then. But if a co-worker says, he told me to do this for insurance, why isn't that a good faith belief by the employer? It wasn't an iron. It—but why isn't that good enough in DeVos? Well, in— If— Right, DeVos, they did ask. If they're wrong— In fact, she admitted the issue in DeVos. Right, but if they're wrong about the reason, they're wrong. It's factually wrong. But they have—but there's no reason to believe that it's not the real reason. It—the question here is not who's right or wrong. It's the process. Did they do the process in good faith? Or is this cover for the true reason, which is discrimination? All right, thank you, Ms. Britton. You've saved time for rebuttal. Mr. Hart? May it please the Court. Good morning, Your Honors. My name is Stephen Hart, and I represent the appellee, Southern Company Services. And this case actually presents a couple of different issues. I think, actually, really two issues that are primary, one of which is the evidentiary issue, which the appellate actually didn't even get into. And the issue there, simply put, is whether no reasonable person could agree that the—with that, the appellant's April 11th affidavit that he attached to his response to the company's motion for summary judgment contradicted his March 20th affidavit that he attached to his own motion for partial summary judgment on this FMLA estoppel issue. Now, in the April 11th affidavit, that's where the appellant says, well, had I known I was not protected by the FMLA, I would have returned to work before February 2nd, 2018. That's not contradictory to the other statement. Well, but the other statement in the March 20th affidavit—and here's—let me get into this. In that affidavit where he says, I would have returned to work, he says the reason that he would have returned to work is so that he could explain his motives to his boss, so that he could talk to his superiors. And also he wanted to make a good impression. Absolutely. And show, I'm responding to your coaching, and I'm on my left leg, and I don't want to be fired. Absolutely. So that's not contradictory on their face under the sham affidavit. One of the reasons he said he wanted to return was to talk to his bosses and explain his motives. But in the March 20th affidavit, he says, had I known that I wasn't protected by the meetings that I did take with my bosses, I would not have gone to the January 20th lunch with Mr. Wray at all. I would have canceled that meeting. In other words, I would have chosen to not talk to my boss. I would not have even gone to the February 2nd meeting. I would have chosen not to talk to my bosses. I would have completely— If you're not on protected leave, you're not going to be going around making a bunch of complaints and things because he's concerned that he's on his last leg. That's—I don't—assuming—okay, so your argument is that it's on its face contradictory. That's one issue. We may or may not agree with you. That's one issue, exactly. And to be clear, the courts—this court has said that in previous cases, the issue is whether no reasonable person could agree with the district court's conclusion. It's a—but no, but sham affidavit is a narrow, narrow doctrine, and not for—if there's any wiggle room in what was said. Absolutely, and understood. But beyond that, it's a harmless error standard, which means that where, as in this case, the district court in fact took at face value the affidavit and said, well, even if that's admissible, then the issue goes to whether or not there's any detrimental reliance, which is the issue that the appellant talked about. But here, the district—certainly, the court—excuse me—certainly, the company never said that it fired Mr. Tatum for missing days or for being absent or for missing assignments. It didn't have anything to do with that. And in fact, the district court found that there was no evidence that he was fired for taking leave, which is essentially what the appellant is arguing took place here. He's saying that had he been there on the 23rd or at some other time, he would have not been fired. But there's no evidence— The leave situation, the company is too small to have FMLA, but they do have FMLA? I'm sorry, Your Honor? The company has FMLA leave, right? They call it that inside the company. Yes, they certainly do. Even though they're too small of an employer to be required to have it. That particular location is too small for the FMLA. But they're still doing it company-wide, right? Well, there was an FMLA packet sent to him, sure. Yes. And later, there was an email that said he was on FMLA leave. Right. An email that was sent the day before he got fired, a week after, according to the appellant—a week after Mr. Ray had already decided to fire him. Was he on FMLA leave? He was not on FMLA leave. There had been no decision made about FMLA leave. Not even on February—is it 20th? It was February 1st. Okay. Not even then he wasn't on FMLA when he got the email? The email said he was eligible. It did not say anything about whether or not an FMLA leave had been appointed. There's no issue in this case that the company is not—doesn't do FMLA? There's no issue with respect to the company having sent this email that said you're FMLA eligible. They do FMLA at this company. Sure. The issue here is— Is that right? Yes. The company has FMLA leave? It did have that FMLA leave. Yes, Your Honor. The issue is whether he relied on any representation to that effect. When he was told on January 20th that he was getting the packet sent to his house, did he rely then? No, he didn't. Well, did he? He said he did in his affidavit. Well, he said he relied on the fact that he was going to be sent an FMLA packet, and as we cited in the case law that we've presented in our brief, the mere fact that somebody has sent an FMLA packet is not enough to show detrimental reliance, number one, because FMLA is variable. You don't know whether you're going to get it or not. Okay, but there's a fact that he had done this leave before. This had been his practice when he did it before. Exactly, and as we've also cited in our brief, there are numerous cases that have said the mere fact that you have taken leave on a prior occasion cannot be a representation. This Court, in the Menier case, said there has to be a definite representation of FMLA eligibility, and the mere fact that somebody got FMLA leave last year, that cannot be a definite representation that the person is eligible or able to take FMLA this year, and the reason is because things change. The employer might well have met a 50-employee threshold last year. That has nothing to do with whether it meets a 50-employee threshold this year. 50-employee threshold. That's not even an issue in the case, is it? Because they called it FMLA leave themselves. If they didn't think they had FMLA leave, they would have said, we don't do FMLA for this plant. Well, the 50-employee threshold, Your Honor, does matter because the estoppel theory only matters if the appellant relied on a definite representation. Well, I think an email that says February 20th, we're evaluating your FMLA leave, you wouldn't be evaluating it if you didn't have it, if you don't offer it. And how did he rely on January, excuse me, on February 1st, how did he rely on an email to say, I would have gone back to work on January 20th? How do you rely on something that hadn't happened until two weeks? That's not the reliance that's relevant for the January 20th. The reliance that's relevant to their argument, I'm not saying it's a winner, but that's not the date of the relevant conversation. It's on January 20th when the boss said they were sending him the packet. Right. That's the reliance at issue. And you've already argued that that's an insufficient statement to have been relied upon. Exactly. But that's different than the February one. Right, exactly. And the February one, the reason why the February one can't be reliance is his entire argument is, and the appellant's counsel just stood up here and told you, well, the reliance is I wasn't able to get back on January 23rd to explain my position when Mr. Ray had already decided by the end of the day that he was going to fire me. Well, if the email didn't come until February 1st, he couldn't have relied on it to go back by January 23rd. He could have relied upon if it was sufficient, the statement that we're going to send you the packet on the 20th. Sure. That's the issue. Was that statement a reliable thing to estop the employer? No. No, that's the question in the case. Right. And I know your answer's no. Right. My answer to that is no, and we've talked about that in our brief. So can you tell us, do you win any other way? Sure, Your Honor. We absolutely do win another way. We win beyond the entire issue of whether or not the FMLA applies. We win on the implicit ruling of the district court. It actually did not reach the question on whether the FMLA concluded it didn't apply for the reasons that we've talked about. But implicit in the court's ruling was that the company gave a legitimate nondiscriminatory reason and that there was no evidence that that reason was a pretext for FMLA retaliation and no reason that that was a pretext for firing him for taking FMLA, which, as the appellant's counsel just stated, it is something that they would have to prove even on an FMLA interference theory. And this court's case law has been very clear about that point. When the appellant's chief issue is, well, you didn't reinstate me, you fired me, then in order to establish FMLA interference or retaliation, you've got to show retaliation. You've got to show that the company is lying about its reason. And Judge Elrod, you asked the key question, isn't it okay for the employer to rely on a co-worker's accusation? And the answer, according to this court's jurisprudence, has always been yes. Going back to the Wagoner case from 25 years ago, this court has repeatedly said and said in that case, where an allegation is made by a co-worker and the company relies on that allegation and chooses to discharge an employee based on it, the issue really isn't whether or not the company is lying at all. The issue is whether the employee is lying. And that has nothing to do with whether the company is lying. And the company has and is able to rely, in good faith, on an accusation from a co-worker in making its decision. The appellant's entire argument has to do with this idea that there was some sort of about-face between the January 20th and January 23rd. And the fact of the matter is that the company, in gathering evidence, and she also says, well, there was no factual investigation. There was a factual investigation. The company interviewed Mr. Finn. And it talked to Mr. Finn about it. And he said, well, you know, Mr. Tatum told me that I take this picture as evidence and I sat on it for a month because it's job security. I have two questions. Sure. First one is, there can be a problem with discharging if they treated the other employees differently with regard to the same accusation. If the employee was similarly situated, yes. Goodman and Finn, why aren't they similarly situated? They're not similarly situated for a number of reasons, which we explain in our brief. Number one, Mr. Finn was a brand new employee. He was a trainee. He didn't have years of experience like Mr. Tatum did. Number two, Mr. Tatum is the only person who perceived there to be a safety violation. Mr. Finn didn't even perceive there to be any safety issue with what he witnessed. So those are two reasons right off the bat why they're not similarly situated. And number three, Mr. Tatum is the one who had disciplinary issues. He had been coached as it's undisputed. He had been coached. He had been talked to. No, he did not. Okay. Then the second question I had concerns whether or not SCS generally granted employees an opportunity to be heard before terminating. Your Honor, that's... It was argued by opposing counsel. Right. And I'm not sure that that's in the record. No, that's not in the record. What the appellant actually said in her own brief, as she talks about disciplinary policies in her brief, she actually says on page five of her main brief, or excuse me, the appellant says on page five of his main brief, that the policy says employees can be terminated at any time. And no matter what it says in the policies about any kind of discipline, those steps can be skipped. This was an... The appellant says you should have a hearing or an interview. No, there's... He says that? No. Frank with me. There's nothing... There's nothing in the record that guarantees an employee some sort of hearing. This is not a due process employer. This is an at-will employer. Yes, does it have disciplinary policies? Sure. Does it talk about procedures? Sure. It always says that those things are a guide. Not that they're... It says it's a guide that you should have a hearing. What does the guide actually say? There's nothing that I've seen in any... Anything in the record that says that an employee is due some sort of disciplinary hearing or awards to that effect. Let's be more precise. So is there a written guide that's in the record, in this record? There are disciplinary policies in the record, yes. I've not seen where any of those policies guarantee or say that an employee is supposed to get some sort of hearing. It's not... Maybe not the word hearing, but a chance to be heard. I'm not aware of that. A meeting of any kind. I'm not aware of that. What I am aware of... We rely on you to... It sounds like you're trying to avoid the question. It sounds like you're... Just a minute. You're bad about jumping on judges' questions before they've finished. So let's be very careful about what we're asking. We're asking, number one, are there one or more written policies that are anywhere in this record? That's question number one. Number two, if there are, I mean, you're counsel and you're supposed to help us with what's in the record. So tell us whether there's anything in those policies, if they're in the record, that say anything about a meeting or an opportunity to explain or a hearing or anything like that. Not that I'm... Not that I've seen, Your Honor. I can't... Is the answer no? The answer...  Right. Right. And I've studied the policies. I've not seen that. And my answer is no. So the answer is there is nothing in the policy, is your answer? Right. Yes. Okay. Okay. Anything else, Mr. Arnn? Yes, Your Honor. So, the, I'd like to touch on, on very briefly the idea that there was, with regard to pretext, the, the appellant also said, well, you don't have to do that.     You don't have to do that. You don't actually have to show the comparator assembly situated. That's just not correct, according to the court's case law. And one final point on this entire issue. To the extent that the appellant is arguing that, well, they have treated him, they have treated this as FMLA in the past and actually given him leave, two points on that. The first point is this. The prior occasion in 2015 where the appellant took a leave, it was because he failed a drug test. And at that point in time, if the company wanted to fire him for taking a leave or for being absent or for, for anything having to do with that, that would have been the time for them to do it. And, I'm sorry? I'm, I'm sorry. I don't understand the point. It goes to the, it goes to, it goes to the pretext issue, Your Honor, where the appellant is arguing, well, no, this is all pretext. They fired him for taking an FMLA leave. It goes to pretext. It shows that there is no pretext. If they were treating employees as, as being FMLA eligible in the past to the estoppel theory and, and as it goes to the pretext issue, if the FMLA applies, it shows that there was no pretext. And then secondly, this Court has repeatedly held in, in cases that where, where a company has a record of treating an employee as, of giving an employee FMLA leave, it really undercuts the idea that on a particular occasion, the company has retaliated or chosen to not give the employee FMLA entitlements on a subsequent occasion. This Court has held that in Troutman v. Time Warner, 756 F, Fed Appendix 421 back in 2018, and Garcia v. Penske Logics, 631 Fed Appendix 204. So the entire argument that the appellant is making with respect to his estoppel theory, that while on the prior, in prior occasions they treated me as having FMLA and granted me FMLA leave and I had no problems with taking leave, that actually cuts against his entire argument here that on this particular occasion, that the company was, was, was doing this and firing him because he took an FMLA leave. Thank you. All FMLA aside, would there be an alternative ground to affirm the District Court based on Tatum's history to justify firing, his employment history? Well yes, his entire employment history is what they considered and really the last Trout incident was the fact that they learned that he had taken this picture and sat on what he believed to be a life-threatening safety violation for five weeks and only brought it out when he thought he was actually in trouble, when he thought that he was going to be fired and the proof of that is in the record where he said that, he said that when he went to his doctor on January 20th, which was a pre-existing, pre-existing appointment, he said he thought he was going to be fired and that was based on the counseling that he had gotten before he left, before he ever said anything about FMLA. The, the, the last straw piece of that was the safety violation reported with these pictures that showed he had sat on this for what any reasonable person would, would find to be just a bad faith method of insurance. Is that enough to affirm without getting into the FMLA? It's enough to affirm that there was a legitimate reason, yes, Your Honor. And whether the FMLA applies or not, that is a legitimate reason to affirm the district court's decision. So spotting the FMLA estoppel, you still think you win on that point? Yes. All right. Thank you, Mr. Hart. Thank you. Ms. Britton for her vote. So there's been a lot of discussion about any kind of a written policy and I went back and looked at your opening brief, pages 27 through 31, where you talk about the company, as you say, departs from its usual course of investigating incidents leading to discipline, including speaking with the employee themselves. And I've read it through twice, but I might have missed something. But I don't, you, you, you refer to cases such as DeVos and Jackson in which those procedures were used. I don't find anything in here where you've shown us anything in this record to indicate that this company had any kind of a written policy in this regard. So can you, can you help us out? Yes, Judge Smith. Southern Company Services has a disciplinary policy, an FMLA policy, they have global policies. Their disciplinary policy is at ROA 595. Now, in addition to Southern's global policies, the plant itself has practices. And I asked Ron Ray to detail, you know, in his deposition, what coaching and not only gathering process. Okay. Well, first of all, let's, because you're, you're going to run out of time pretty quickly. So what, what, what does record page 595 say about having a meeting or a hearing? Their first line, structured interaction between the supervisor and subordinate. That's the point of a disciplinary policy. What exactly does it say? I'm quoting it. Structured interaction between the supervisor and subordinate. That's the point. But that doesn't require a meeting. Interaction is a two-way conversation. And then at ROA 583, Ron Ray talks about why all that's, why he does that, why he coaches, asks the person. The process, I asked him what was his process for terminating Brandon in particular. That's at ROA 578. He says, looking at everything that happened over all those years, and part of the whole process would be talking to HR, talking to everyone involved. Brandon Tatum is part of everyone involved. He didn't. He went against his own practice. When you, and he details, you know, talking with Brandon at 583, that's just for the very minimum level of discipline. He would talk to Brandon, get his point of view. And he wouldn't do it for the ultimate discipline. Because he had just coached him, and then he finds out that he's a liar about this other thing, allegedly, according to the coworker. And I'm not saying he is, in fact, a liar. I'm just saying according to the coworker. So why, I mean, at that point, he's already at the last straw, and then he finds out there's another thing. So why did he, I mean, you're not saying their policies require that. Reed, so, I mean, this court has looked at those issues. The justification, it doesn't matter whether it's true or not. What's the process? Was that process done in good faith? And where you don't talk with the person, give them a chance to explain, where you've given them a last chance, and then you go against it. Wheat versus Florida Parish Juvenile Justice Center, Richardson. But they didn't give them a last chance and go against it. They gave him a last chance, and then they found out something else on top of it. He never had an interaction with a coworker. In fact, his job was to report safety. That was Mack Finn's job as well. He did his job, and it was days after verifying there was a safety issue. He followed his coaching. You can see the clearance record where it shows his last entry was days before, and the days after he reported the issue. That was his job, and that's not a legitimate reason to terminate somebody. Again, I'd ask this court to reverse because there are fact issues here where a jury could find in Mr. Tatum's favor. Thank you.